# Exhibit A



# **CipherBlade**

## Blockchain Investigation Agency

# PRELIMINARY EXPERT REPORT

|  |  |
|---|---|
| **Matter:** | FTX Exchange |
| **Written By:** | Paul Sibenik |
| **Date:** | 12.16.2022 |

## Introduction

1. In accordance with instructions from Moskowitz Law Firm, PLLC, I have been instructed to prepare a preliminary expert report surrounding FTX Exchange,

2. More specifically, I have been asked to provide a preliminary opinion on FTX 'Earn' accounts, FTT Token, and FTX Exchange in general, as well as the risks that could affect consumers inherent in them. I have furthermore been asked to provide a technical opinion assessing if or how FTX Earn accounts meet the Howey Test.

3. I am the Lead Case Manager at CipherBlade, a leading blockchain forensics and cybercrime investigative firm which consults with blockchain projects, numerous police, law enforcement and regulatory agencies around the world, including the US FBI and US Secret Service, cryptocurrency exchanges, and other organizations. Other CipherBlade staff and I have experience in some of the most high-profile cryptocurrency investigations to date in relation to a wide range of niches including but not limited to cases involving hacking, theft, SIM-Swapping, ransomware, different types of frauds and scams (e.g., involving ICOs, NFTs, investment fraud, Ponzi Schemes), 'rugpulls,' embezzlement, as well as civil matters such as divorce cases and bankruptcy cases. I am recognized as one of the few experts in blockchain forensics and cryptocurrency cybercrime investigation. This work regularly requires the analysis of cryptocurrency transactions, wallets and addresses, alongside gathering and analyzing other data sources.

4. I regularly use blockchain forensics software to assist me in blockchain investigations. My usage of blockchain forensics software in this matter, has, thus far been extremely minimal. However, I expect blockchain forensics to play a more important role in this matter as this case develops and disclosures are obtained. For reference, however, I primarily utilize Chainalysis Reactor, which is the leading blockchain forensics software available and is utilized by various law enforcement agencies around the world, including the FBI, USSS, DHS, and DEA in the United States. Chainalysis Reactor helps professionals to better understand the flow of funds on assets on supported blockchains. It helps to aggregate and manage large amounts of transaction data and addresses to make the data more parsable. It helps professionals like me to better understand which addresses are under the control of the same individuals or entities, and for addresses that are under the control of a service or exchange, it is often able to identify the name of that service or exchange. Furthermore, Chainalysis Reactor also provides Open-Source Intelligence (OSINT) on various cryptocurrency addresses, which can help investigators understand what those addresses may be

associated with or can provide additional context in situations. I have a Chainalysis Reactor Certification (CRC), which is a certification offered by Chainalysis to certify knowledge and understanding of their Reactor forensics tool. I also have the Chainalysis Investigation Specialist Certification (CISC), an additional certification by Chainalysis designed specifically for the most advanced Reactor users, which dives deep into advanced investigative techniques and obfuscation approaches sometimes used by individuals trying to launder ill-gotten cryptocurrency. I furthermore have the Chainalysis Ethereum Investigations Certification (CEIC), a certification program focused on Ethereum, as well as other EVM (Ethereum virtual machine)-compatible cryptocurrencies.

5. Additionally, a large portion of my work involves consulting with blockchain companies in various capacities pertaining to preventative measures they can or should take to reduce risks and mitigate the amount of cybercrime that their company is exposed to. This involves consulting on security practices, including those pertaining to cryptocurrency storage and management. This also involves consulting on matters of compliance so as to significantly mitigate the likelihood and/or frequency of ill-gotten funds being laundered through their service and reduce the amount of various types of fraud, including investment scams, romance scams, impersonation scams, and money muling.

6. A copy of my CV is attached in Appendix A.

7. This is a preliminary report and is subject to change. I reserve the right to amend the views expressed in this report should or when additional information be uncovered or presented to me.

8. Prior to accepting instructions to act in this matter, I made reasonable inquiries to identify any actual or potential conflicts of interest in connection with the parties concerned. No matters arose.

## A Primer on Cryptocurrency Exchanges

9. Before delving into the issues at hand, I think it's first pertinent to provide some background information on what cryptocurrency exchanges are, what purpose they serve, and how they operate, in relation to the matter at hand.

10. In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry.

11. More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

12. The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability or IOU of the exchange to its customer.

13. If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

    a) Trade it for another cryptocurrency

    b) Trade it for fiat currency

    c) Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

    d) Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

14. The exchange accounts should very much be regarded as being custodial in nature. This means that the customer does not *control* access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

15. One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

16. For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*

> *"None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."*[1]

17. While FTX violated their own terms of service, it's would also have been true that some of these claims would have been demonstrably false to begin even if there was hypothetically no wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature.  This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

18. With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

19. While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented, for reasons I will demonstrate later in this report.

20. The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

---

[1] https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf

21. Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can investment customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent.

22. Exchanges on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

23. Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted.

24. Due to the aforementioned reasons and risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets.

25. The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money.

26. This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[2] often in spectacular fashion. The most common reasons for an exchange's failure include:

    a) The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency.

    b) The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency.

    c) A hack or theft by an external actor

    d) Embezzlement, or theft by an internal actor, typically founder(s) of the exchange

    e) Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

27. When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back.

28. Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. However, what an exchange says, and what they actually do are two different things entirely. It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. FTX was not an exception to this trend. One should not assume or believe that an exchange is any of these things just because they make such claims.

29. This is not to suggest that exchanges cannot be a much safer place to store assets. They can be with appropriate regulation and oversight. In fact, it appears that for FTX Japan[3] specifically, those investors will be made whole or almost whole due to sensical regulations that were put in place in light of the lessons learned from the

---

[2] https://www.cryptowisser.com/exchange-graveyard/

[3] https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/

failures of Mt. Gox and Coincheck exchanges in Japan.

## FTX Earn Program

30. The FTX Earn program was a yield-bearing account that FTX customers were offered.[4] It was also offered on FTX.us for US persons.[5] The FTX website describes it as follows:

> *"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."*

31. The yield that customers were offered is also outlined on the same page – 8% APY (Annual percentage yield) for total collective deposits under $10,000 USD equivalent, and 5% APY for collective deposits above $10,000 USD up to $100,000 USD, and no APY for amounts in excess of $100,000.

| Assets supported | Amount | Rate |
|---|---|---|
| All crypto and fiat | Up to $10,000 | 8% |
| All crypto and fiat | All funds after $10,000, up to $100,000 | 5% |

*Example:*

A. I have $10,000 USD in my account. I will earn **8% APY** on my deposit of USD.

B. I have $5,000 USD value each of Bitcoin and Dogecoin in my account, plus $10,000 worth of USD. I will earn 8% APY on the first $10,000 worth of assets deposited regardless of asset, and 5% APY on the next $10,000, for an average APY of **6.5%** on my total deposit.

All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate. In Example B, you will earn 6.5% on both the DOGE and the BTC. **There is no way to designate one coin to earn 8% and the rest at 5% - they will all earn at the same average rate based on how many coins you are holding.**

32. FTX's Earn program is very similar to that of Voyager's earn program, and programs offered by Celsius and Blockfi, all of whom have filed for bankruptcy. The differences

---

[4] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn
[5] http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/9081464675735-FTX-Earn

between these programs are minimal and involve differences in phrasing 'yield' vs 'interest' vs 'rewards,' the APY offered, the frequency of payout, and the assets that were supported.

33. The FTX website does not describe how, exactly, FTX will generate the applicable yield, and does not indicate what risk factors may be apparent that could result in the inability to pay such yield.

34. The website does suggest term 'staking' however as a means of generating yield when they indicate that:

> "*By opting in and participating in staking your supported assets in your FTX account*"

35. This naturally gives the impression that their assets would be used for 'staking' without being 100% clear about it.

36. The word 'staking' in the context of cryptocurrency is understood to have a technical meaning. 'Staking' is associated with a consensus mechanism known as 'Proof of Stake'(PoS) and relatedly, 'Delegated Proof of Stake,'(dPos) which *some* cryptocurrencies utilize, but many don't (such as Bitcoin for example, which uses 'Proof of Work' as a consensus mechanism).

37. Staking has a similar purpose for cryptocurrencies that utilize PoS and dPoS as what 'miners' are offered from cryptocurrencies that utilize Proof of Work. Individuals involved in staking are responsible for verifying transactions and they used their staked assets (instead of sunk costs associated with expenditure of electricity and equipment) as a way of guaranteeing the transactions they verify and add onto a blockchain are valid. If they try to add an invalid transaction, staked assets are typically burned as punishment, which creates a disincentive to act dishonestly or maliciously. In exchange for staking, users are awarded compensation accordingly in the form of newly issued cryptocurrency.

38. FTX is not itself a cryptocurrency operating on a PoS model; FTX was an exchange. One cannot 'stake' assets on an exchange. One can lend them to an exchange though, and theoretically, that exchange could then stake select cryptocurrency assets on behalf of the user (for cryptocurrencies that have Proof of Stake).

39. While there is disagreement over whether or not 'staking' is itself a security, the issue is that FTX did often not 'stake' customer assets, and indeed in many cases *could not* stake customer assets since not all cryptocurrencies utilize Proof of Stake. Yet the FTX website clearly suggests that 'all assets' in the account are subject to applicable

yield, including fiat assets (such as USD), which obviously don't even have a staking mechanism if FTX wanted to utilize it.

40. Rather than 'staking,' it appears that a primary thing FTX was doing was lending customer assets out, even from applicable that weren't part of the 'Earn' program, most notably to Alameda.[6] There are allegations that Alameda received loans from FTX interest-free.[7] Sam Bankman-Fried was a primary equity holder of both companies. FTX choosing to lend out assets, whether for free or otherwise, has nothing to do with actual staking of cryptocurrency.

41. The 'staking,' described on the FTX is purposely misleading, and not a representation of what was being offered. Users were not given the ability to 'stake' on FTX. They were given the ability to lend to FTX, and FTX would in turn invest and re-lend those assets out to questionable entities, on questionable terms, and such loans were not appropriately collateralized.

42. That being said, as it appears that even for users that did not subscribe to the Earn program, FTX leveraged and loaned out customer assets anyway to a large degree. It furthermore appears that while there were separate legal entities behind ftx.com and ftx.us, the two entities may not have been operated all that differently from one another, with Sam Bankman-Fried a primary equity holder of each, and just how independent the two entities were from each other is very much a matter of concern.

43. From a securities perspective, the Howey Test defines an investment contract as:

   a. An investment of money

      i. Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

---

[6] https://pacer-documents.s3.amazonaws.com/33/188450/042020648197.pdf

[7] https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html

b.  In a common enterprise
    i.  FTX customer assets are almost always consolidated in wallets
        operated a controlled by FTX at least initially. These wallets are
        typically referred to as 'hot wallets' or 'consolidation wallets.' From
        these wallets, cryptocurrency can be move to other FTX-controlled
        wallets, or it can be used to pay back other customers performing
        withdrawals, but FTX can and did send (and loan) out such assets to
        other entities, including Alameda Research 'Alameda.' The
        blockchains data contains an immutable and verifiable record of data
        that shows that FTX customer deposits went into accounts operated by
        a common enterprise, namely, FTX.

c.  With the expectation of profit
    i.  FTX customers are promised yield when they participate in the Earn
        program. And at up to 8% yield, that is a considerable amount that
        would be considerably in excess to that of a savings account at a bank.
        But it was also far riskier than investing money in a savings account at
        a bank. FTX goes out of their way to advertise this yield, and indicate
        that such earnings are to be calculated on the "investment portfolio"
        that is stored 'in' the FTX app.[8]

d.  To be derived from the efforts of others
    i.  The FTX Yield-bearing account was portrayed as passive income
        stream. A customer needs to do nothing more than ensure they are
        subscribed to the yield program, and that they have deposited assets (of
        crypto or even fiat) in order to earn the 5% or 8% yield, which they
        clearly indicate is counted hourly. There is no further work or action
        needed on the part of the user.
    ii. The work that 'others' (namely FTX) would need to do would
        including, at a baseline, sending transactions. But it would also require
        FTX to make an effort by leveraging and investing the money
        elsewhere which could theoretically come about either via giving out
        loans, employing trading strategies, 'staking,' making other
        investments, or giving out loans to entities (such as Alameda) that

---

[8] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn

would employ such strategies. The primary strategy that FTX portrayed to investors was 'staking' as I discuss in the following paragraphs.

## Importance and Role of Brand Ambassadors

44. FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims

> *"With FTX, I have everything I need to buy, sell, and trade crypto safely"*

45. Kevin O'Leary, another FTX brand ambassador stated:

> *"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and regulatory compliance requirements"*

46. Given that FTX continually misappropriated customer assets, didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

47. Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Shark's make investments in startups. With those investments comes due diligence. Mr. O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

48. Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

> *"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but*

*we also relied on another investment theme that I felt drove a lot of interest in FTX[9]"*

49. Mr. O'Leary is also a strategic investor in what is allegedly Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

## FTX and Representations of Safety and Risks

50. The yield that users could receive as part of the FTX Earn program, as previously mentioned was 8% APY for total collective deposits under $10,000 USD equivalent, and 5% APY for collective deposits above $10,000 USD up to $100,000 USD, and no APY for amounts in excess of $100,000.

51. This type of yield structure makes no logical sense from a profitability standpoint. Why would a financial institution offer a lender a *lower* yield when they loaned more, and no yield at all beyond a certain threshold? As a business, should they want to pay out lower yields to a smaller number of people than higher yields to a larger number of people?

52. In my opinion, the reasons that FTX had this yield structure was so that they could mitigate their legal risks to customers. Simply put, a customer who loses $4,000 due to FTX's misappropriation of funds is very unlikely pursue action against the exchange, such as litigation. A customer who loses $4 million is much more likely to.

53. FTX did have a legal disclaimer associated with their Earn program, shown below:

---

[9] https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/

## Legal Disclaimers and Terms of Service

Services are provided by FTX for its customers.

**APY refers to projected yield by staking. This yield is not interest and is not guaranteed, and changes based upon terms of applicable staking programs. FTX transmits value from your account to staking program and ensures that the value is properly transmitted to and from the program. Your customer balance is not a bank account, and is not insured.**

Only customers of FTX may be eligible to participate in the yield program.  If a customer is eligible and opts into the program, then their assets will be used to generate a fixed yield for the user.

While FTX does not anticipate any problems, it does not guarantee the future or present yield payments in the case of malfunction, although it would not intend to claw back previously received yield.  FTX *does* back the principal generating the yield with its own funds and equity.  Nevertheless, users should exercise appropriate caution when deciding whether to enable yield for their accounts.

54. FTX again refers to staking numerous times, suggesting this was what they were primarily doing with customer assets, which wasn't true, and indeed wasn't even technically possible for a large portion of the assets that customers deposited.

55. FTX indicated that for customers who opt-in to the Earn program, FTX would take their assets to generate a fixed yield for the user, presumably via 'staking.'

56. The legal disclaimer, and certainly the brand ambassadors grossly misrepresented the level of risk associated with its Earn program. While FTX does indicate that it's 'not a bank account, and is not insured' and that 'users should exercise appropriate caution when deciding whether to enable yield for their accounts,' this hardly seems like a sufficient disclaimer and disclosure that would accurately represent the real level of risk. It certainly does not reveal that funds will be lent to affiliated entities to perform highly questionable and risky trading strategies, the lender will collateral FTT tokens with FTX for safety.

57. The FTX Earn program was clearly represented as being 'opt-in' and not 'opt-out.' However, in a declaration from Joseph Rotunda, the Director of Enforcement at the Texas State Security Board, he describes how he, as a US citizen, went to the FTX website, downloaded the FTX Trading App. He funded his account with $50, and "the default settings were automatically configured to enable earning of yield."[10] clearly notes that the earn program he was auto-enrolled in was associated with FTX US, not FTX Trading.

58. Thus, FTX's assertion that the FTX.US yield program were strictly opt-in was not true. It's certainly possible that when some US persons registered for FTX, the Earn program might have been opt-in in some cases but based on the series of events

---

[10] https://cases.stretto.com/public/x193/11753/PLEADINGS/1175310142280000000134.pdf

described by Mr. Rotunda, it's clear at the very least that a considerable portion of US persons that registered would have been auto-enrolled in the yield program. This would make it such that those users that were auto-enrolled (and who did not opt-out) appear to have engaged in an unregistered securities transaction as soon as any money was deposited to their account, whether fiat or cryptocurrency.

59. This means it appears that brand ambassadors were promoting a company and application that at least in some cases auto-enrolled US persons in the FTX Earn program which would reasonably be considered a security in my opinion, and which was also being lauded as 'safe' and 'compliant.'

## The FTT Token and Alameda

60. The FTT Token was an instrumental part of FTX's demise. FTT Tokens were created and issued by FTX, and FTT provides various benefits to its holders on FTX Exchange. The benefits include, most notably, trading fee discounts, but also ancillary benefits such as early access to token sales on the exchange.

61. It is not uncommon for many of the larger cryptocurrency exchanges to build in contrived 'utility' (such as trading discounts) for tokens that they themselves create because it can be financially lucrative for the exchange, since as the issuer they would typically retain a sizable portion of the tokens, and could elect to sell those tokens at some point, when the price is advantageous.

62. Similar to equity, the financial success of an exchange's token (FTT) is tied to the financial success and popularity of the exchange. This is because as the exchanges gains new customers, more and more customers will naturally want to buy FTT, either so they can have a discount on trading fees, or because they think the price will increase (possibly a result of new customers and demand for FTT). However, the holders of FTT have no legal rights voting rights that they would have with an equity investment.

63. Thus, as the number of customers that exchange has increases, as is often the case in a 'bull market,' the price of FTT could generally be expected to increase in value. However, in a bear market, when there is less demand and interest, and fewer new users signing up, there is naturally a lower demand for FTT that would generally cause the price to decline.

64. It is apparent that FTX (and FTX.us) effectively gave Alameda research an unlimited credit line, and Alameda could then effectively use FTX customer assets in extremely high-risk trading activity and strategies, and loans that ultimately left Alameda in extremely poor financial condition.

65. Alameda research allegedly largely provided FTT tokens (which were presumably issued or given to them by FTX) as collateral to FTX in order to obtain the loans from FTX. However, FTT tokens are highly volatile and ultimately subject to investor confidence in FTX itself. When that confidence and interest in FTX began to wane, the price of FTT started to collapse, and with that, the collateral that was designed to cover Alameda's bad debts.

66. FTX now has a bunch of comparatively worthless FTT on their balance sheet, and the price of that obviously won't recover measurably. Given what FTX's misappropriation of customer assets (both in and outside of the Earn program), investors were essentially invested in FTT tokens in large part even if they didn't know it or buy directly themselves.

## Verifiable FTX Falsehoods

67. It's evident that the FTX group was grossly mismanaged and misappropriated customer funds. It is still the early stages of finding out about all the misconduct. Much of the misconduct that has been revealed thus far and will be revealed in the coming months would not necessarily have been immediately known to brand ambassadors. This begs the question as to what are the falsehoods that were or should have been apparent to FTX brand ambassadors when partnering with FTX initially, well before their collapse?

68. The first, as we've already discussed is the claims regarding staking. Cryptocurrencies like Bitcoin and Dogecoin, which FTX offers, cannot be staked. And fiat currency (which FTX also offered yield on) also cannot be staked. Yet, FTX offers yield for them on the Earn Program. The fact that FTX would not technically be able to stake applicable cryptocurrency assets on behalf of customers as they have said and pay back yield in the same currency / cryptocurrency, was always a giant red flag that was demonstrably false, and which should have been recognized by anyone promoting FTX.

69. The second verifiably false claim by FTX that would have been evident publicly well before their downfall relates to FTX's claim that only the user has control of digital assets in their account:

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."*

15

As mentioned previously, FTX exchange accounts are custodial in nature. This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. Whether or not such requests are processed are dependent on the willingness, ability and approval of the exchange. It is very much the exchange that *controls* the assets, not their customer.

70. An additional claim in this quote that could also be argued is verifiably false is the assertion that digital assets are held 'in' the account at all (even if the exchange wasn't misappropriating funds). On a technical level, an exchange account cannot hold or store cryptocurrency. However, exchange accounts can store a record of liability for that cryptocurrency, that an exchange may have to its customer. However, because this concept of 'storage' can be difficult for people to understand, it's somewhat common, at least for newcomers and those less educated with cryptocurrency to discern that a balance held on a cryptocurrency exchange account is equivalent to those assets being 'stored' on the exchange. What a customer(s) balance is versus what an exchange actually stores in its own custody on behalf of the user should not be assumed to be the same thing; there is no regulation or assurance guaranteeing or requiring that. Only an exchange's terms of service, which might contain such language, might guarantee that, but even if it does, such terms may not be adhered to (which was the case here).

71. A third major red flag should have been readily apparent is the non-sensical yield structure for customer accounts, which in my opinion was designed in such a way so as to onboard users. As previously mentioned, this was most likely doing to limit legal risks that FTX could incur, since investors who lost smaller amounts of money are much less likely to pursue action than investors that lost considerable amounts of money.

72. A fourth falsehood should have been apparent in Sam Bankman-Fried's testimony to the US House of Representatives Financial Services committee when he stated:

> *"There is complete transparency about the positions that are held. There is a robust, consistent risk framework applied"*

No, there is not "complete transparency" and the positions that FTXs holds and held. While most cryptocurrency operate on public blockchains, the entities that own specific wallets, who controls specific accounts, and loans that are made by an exchange are not publicly available simply because such blockchains are public, and such information was not disclosed by FTX. And based on John Ray's affidavit,

FTX's records are so poor it's likely that large swaths of this information won't ever be known.

73. A fifth area of contention that could be said to be demonstrably false (depending on semantics) or at least misleading would be with respect to the FTX Earn program is the use of the term 'wallet.' FTX's page on the Earn program frequently talks about users' wallets (with FTX).

> *"All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate"*

74. The term 'wallet' is one of the very first terms that cryptocurrency users hear of, which they start to use, but term is frequently misused and misunderstood. The 'wallet' terminology FTX uses perpetuates that misunderstanding.

75. A cryptocurrency wallet is inherently 'self-custodial' meaning that there is no institution holding cryptocurrency on behalf of the user, nor does the user need to seed any permission to have nor hold funds in such a wallet. Only the person who created the wallet has ability to access the wallet (unless the credentials to the wallet were to be breached or otherwise accessed by another party). A cryptocurrency wallet is an auxiliary device or medium that holds or stores private key(s) needed to access or spend cryptocurrency balances that have been allocated to address(es) that are part of the wallet.

76. The mere use of 'wallet' in this context is itself a misnomer, and very misleading, because a user *cannot* have a 'FTX wallet' of theirs. There is no such thing. A user can have wallet(s), and a FTX account, or both, but there is no such thing as an 'FTX Wallet' belonging to the user. FTX Exchange did have and control many different wallets, but for any given customer, FTX Exchange did not hold funds in a unique wallet only for that customer; that's simply not how exchanges work.

77. These are just the obvious falsehood and red flags that would be apparent on the surface. If brand ambassadors obtained information or knowledge about the inner workings of FTX, it's very likely that they would have encountered additional red flags.

**// ENDS**

Paul Sibenik
Lead Case Manager
CipherBlade